UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SHERYL MCQUILLIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 515 DDN |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM**</u>

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Sheryl McQuillian's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

**I. Procedural History**

Plaintiff Sheryl McQuillian filed an application for disability insurance benefits (DIB) on June 2, 2010, alleging that she became disabled on April 30, 2009, because of fibromyalgia, anxiety, depression, bladder problems, attention deficit disorder (ADD), thyroid problems, diverticulitis, endometriosis, and arthritis. (Tr. 109-116, 141.) On September 2, 2010, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 56, 57, 58-62.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on November 3, 2011, at which plaintiff and a vocational expert testified. (Tr. 38-55.) On February 13, 2012, the ALJ issued a decision denying plaintiff's claim for benefits, finding plaintiff able to perform work as it exists in

significant numbers in the national economy, and specifically, office helper and stock checker. (Tr. 10-37.) On January 24, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-7.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ's residual functional capacity (RFC) assessment is not supported by some medical evidence in the record because of the ALJ's failure to properly weigh the medical opinions of plaintiff's treating providers, Dr. Scheperle and Dr. Bernstein. Plaintiff also contends that the ALJ failed to properly undergo the analysis required when considering a diagnosed impairment of interstitial cystitis. Plaintiff further argues that the ALJ erred by considering plaintiff's failure to follow prescribed treatment without determining whether such treatment would restore her ability to work. Plaintiff also contends that the hypothetical question posed to the vocational expert was based upon an improper RFC assessment, and thus that the ALJ erred by relying on the expert's testimony to find her not disabled. Plaintiff requests that the final decision be reversed.

Because the ALJ committed no legal error and substantial evidence on the record as a whole supports the ALJ's decision, the Commissioner's final decision that plaintiff was not disabled is affirmed.[1]

---

[1] The ALJ determined plaintiff's claimed impairments of thyroid problems and diverticulitis not to be severe impairments and that plaintiff's claimed anxiety was not a medically determinable impairment. (Tr. 15-20.) Plaintiff does not challenge these findings. Nor does plaintiff challenge the ALJ's analysis relating to the effects of plaintiff's ADD. While the undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, the recitation of specific evidence in this Memorandum and Order is limited to only that relating to the issues raised by plaintiff on this appeal.

**II. Relevant Testimonial Evidence Before the ALJ**

A.      Plaintiff's Testimony

At the hearing on August 10, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-one years of age.  Plaintiff graduated from high school and thereafter attended vocational school for one year.  (Tr. 41.)

Plaintiff's Work History Report shows that plaintiff worked as a retail clothing salesperson from 1978 to 2005.  Plaintiff worked as a mechanical drafter and designer from 1980 to May 2001.  From June 2003 to April 30, 2009, plaintiff worked as a salesperson for various furniture companies.  (Tr. 178-90.)  Plaintiff testified that she was terminated from her last job because she was making mistakes, missing work, and failing to ask customers requisite questions.  Plaintiff testified that such circumstances were caused by pain-induced confusion, forgetfulness, irritability, and absenteeism.  Plaintiff testified that she received unemployment compensation for one year after this last period of employment.  (Tr. 44, 50.)

Plaintiff testified that she currently has pain all over, including pain in the pelvis, knees, elbows, jaw, and back.  Plaintiff testified that she also suffers from fatigue.  Plaintiff testified that the combination of pain and fatigue causes her to become confused and "bothered."  (Tr. 48-49.)

Plaintiff testified that her pelvic pain is related to conditions for which she previously underwent surgeries, including procedures for endometriosis, a hysterectomy, and related reconstructive surgery.  Plaintiff testified that such surgeries occurred prior to April 2009.  (Tr. 45-46.)

Plaintiff testified that she sees a chiropractor for muscle pain, back pain, and knee pain and that her internist, Dr. Scheperle, diagnosed her with fibromyalgia.  Plaintiff testified that she has never been referred to a rheumatologist.  (Tr. 47-48.)

Plaintiff testified that she previously saw Dr. Georgia Jones in the 1990's for

depression and anxiety and that she visited her again for five or six months in 2010. Plaintiff reported that she stopped seeing Dr. Jones because she was doing better and was taking medication received from another physician. Plaintiff testified that she was currently depressed because of the pain she experiences. (Tr. 46-47, 49.)

As to exertional abilities, plaintiff testified that she can stand for twenty minutes before needing to lie down. Plaintiff testified that she lies down for about eight hours during the day because of pain, fatigue, and medication side effects. (Tr. 49.)

As to her daily activities, plaintiff testified that her mother helps with household chores and that her parents pay for someone to care for the yard. (Tr. 50.)

B.    Testimony of Vocational Expert

Dr. Jeffrey Magrowski, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ asked Dr. Magrowski to consider an individual of plaintiff's age, education, and work experience and to assume the individual to be able to perform the full range of light work. The ALJ asked Dr. Magrowski to further assume the individual to be

> able to understand, remember, and carry out at least simple instructions of non-detailed tasks; can respond appropriately to supervisors and co-workers; can adapt to routine simple work changes; can perform work at a normal pace without production quotas; and should not work in a setting, which includes constant, or regular contact with the general public.

(Tr. 52.) Dr. Magrowski testified that such a person could not perform plaintiff's past relevant work but could perform light, unskilled work such as office helper, of which 4,000 such jobs existed in the State of Missouri and over 200,000 nationally; and stock checker, of which 2,000 such jobs existed in the State of Missouri and 100,000 nationally. (Tr. 52.)

The ALJ then asked Dr. Magrowski to assume the individual to be limited to lifting less than ten pounds occasionally and that such individual could sit less than two

hours and stand less than two hours.  Dr. Magrowski testified that such a person could not perform plaintiff's past relevant work nor any other work.  (Tr. 52.)

Plaintiff's counsel asked Dr. Magrowski to further assume the individual to need repeated rest breaks, each lasting up to ten to fifteen minutes.  Dr. Magrowski testified that such condition was incompatible with work.  (Tr. 53.)

## III.  Relevant Medical Evidence Before the ALJ

In August 2002, plaintiff visited Dr. Robert Bernstein, a chiropractor, in relation to pain experienced as a result of a motor vehicle accident.  Plaintiff specifically complained of pain in her neck, left upper extremity, and pelvic region.  Thereafter and through 2008, plaintiff periodically visited Dr. Bernstein for treatment relating to complaints of headaches, jaw and neck pain, low back pain, shoulder pain, and tingling and numbness in the feet and ankles.  Throughout this period, Dr. Bernstein repeatedly released plaintiff to full work duties, with the only limitations coming in December 2004 to not lift in excess of fifty pounds for a period of seven days and in April 2008 to avoid heavy lifting for the remainder of the week.  (Tr. 484-518.)

Plaintiff underwent reconstructive pelvic surgery on December 28, 2007, for uterine prolapse, enterocele, cystocele, rectocele, and absent perineum.  (Tr. 219-20.)  In a letter dated February 7, 2008, Dr. Dionysios K. Veronikis released plaintiff to return to work without any restrictions effective February 11, 2008.  (Tr. 243.)  Dr. Veronikis had previously treated plaintiff for exposed mesh and uterovaginal prolapse as well as for urinary incontinence.  (Tr. 202-05, 221-42.)

From March 2008 to December 2008, plaintiff visited Dr. Helene M. Aisenstat with multiple complaints, including groin pain, low back pain, fatigue, burning with urination, hormonal changes, sleep problems, muscle and joint pain, depression, crying spells, decreased concentration, lack of energy, dizziness, pressure and pain in the upper back, weight gain, chest pressure, left knee pain, overall flu-like pain, urinary frequency, and rectal urgency.  During this period, Dr. Aisenstat diagnosed plaintiff with irritable

bowel syndrome (IBS), cystic pancreatic head, insomnia, depression, and ADD. Plaintiff was prescribed Paxil, Clonazepam, Adderall, Seroquel, Norflex, Meclizine, Otrin, Flexeril, Motrin, and Ritalin for these conditions. (Tr. 437-47, 662-64, 669-70.)

In response to plaintiff's complaints of pelvic pain, Dr. Vaishali Bhalani performed a diagnostic laparoscopy on December 22, 2008, which showed multiple dense and filmy adhesions of the bowel and mesentery to the left and right adnexa, as well as to the vaginal cuff and the peritoneal wall. Some adhesions were removed during the procedure, but the adhesions to the vaginal cuff were too dense to be removed. (Tr. 368-69, 372-73.) On December 26, 2008, plaintiff reported to Dr. Bhalani that her pain was fine and that she had no current issues. (Tr. 364-65.)[2]

On January 14, 2009, plaintiff underwent a thyroidectomy because of thyroid cancer. (Tr. 455-46.)

Plaintiff returned to Dr. Bhalani on April 24, 2009, and complained of pain in the lower abdomen. Dr. Bhalani considered referring plaintiff to a pelvic pain specialist or to someone who could remove the remaining bowel adhesions if said condition was determined to be the continued source of pain. (Tr. 359-60.) On May 8, 2009, plaintiff continued to complain to Dr. Bhalani of fatigue, low back pain, and pelvic pain. Further discussion regarding referral to a specialist was had. (Tr. 357-58.)

On May 22, 2009, plaintiff visited Dr. Melissa Johnson for purposes of establishing a new physician/patient relationship. Plaintiff reported that she wanted to lose weight and that she walked at least one mile a day in this effort. Plaintiff reported constant muscle pain and fatigue, and she expressed concern that she may have fibromyalgia. Plaintiff also reported experiencing dizziness when turning over while lying down. Plaintiff's current medications were noted to include Synthroid, Methylphenidate, and Pristiq. Physical examination yielded normal results except for a hard, calcified deposit in the area of an earlier trauma in the left calf. Dr. Johnson

---

[2] Dr. Bhalani had previously treated plaintiff in August 2008 for symptoms associated with menopause. (Tr. 370-71.)

diagnosed plaintiff with elevated blood pressure, traumatic myositis ossificans, non-neoplastic nevus, attention deficit hyperactivity disorder (ADHD), hypothyroidism, myalgia, abnormal weight gain, and acute bronchitis. Laboratory and diagnostic tests yielded normal results. (Tr. 300-07.)

On May 28, 2009, plaintiff visited Dr. M. Brigid Holloran-Schwartz at SLU-Care's gynecological department and complained of throbbing back pain, excessive urination, and incontinence. Dr. Schwartz noted plaintiff to have endometriosis and a history of lower pelvic pain. Dr. Schwartz noted plaintiff's current medications to include steroids for bronchitis as well as Ritalin as needed. Physical examination showed increased pain with palpation of the urethra and bladder. Dr. Schwartz opined that plaintiff's back pain was likely unrelated to gynecological issues and that bowel adhesions to the vaginal cuff may account for plaintiff's pain. Plaintiff was referred for gastrointestinal evaluation. Plaintiff was also referred to Dr. Andrew Steele for urinary issues. (Tr. 250-53.)

On June 5, 2009, plaintiff reported to Dr. Bhalani that she felt much better after taking Pristiq for depression and menopausal symptoms. Plaintiff was instructed to continue with Pristiq and was restarted on hormone replacement therapy. (Tr. 355-56.)

Plaintiff returned to Dr. Johnson on June 25, 2009, and complained of back pain and dizziness, and of not wanting to get up and "get going." Plaintiff reported having no joint pain. It was noted that plaintiff took Ritalin only when she was working and was currently off of the medication. It was also noted that plaintiff had previously taken Paxil, which worked well for her. Physical examination was unremarkable. Plaintiff was instructed to discontinue Pristiq. Paxil was prescribed. (Tr. 296-98.)

Plaintiff called Dr. Steele's office at SLU-Care on August 3, 2009, and reported being practically bedridden and that she was incontinent even while lying down. Plaintiff reported feeling nauseated while walking. Plaintiff reported having painful bowel movements but that her back pain subsided after such movements. Plaintiff was advised to contact a GI specialist per Dr. Schwartz's instructions. On August 6, 2009, plaintiff

reported to Dr. Steele's office that her pain was worse upon awakening and with lifting. Tylenol #3 was prescribed. (Tr. 248-49.)

Plaintiff visited Dr. Steele on August 25, 2009, with complaints of pelvic pain. Dr. Steele noted plaintiff to have previously undergone numerous surgeries and procedures, each of which provided temporary relief. Dr. Steele noted an earlier scope to show bowel adhesion to the cuff. Plaintiff reported having urinary frequency and incontinence, symptoms associated with IBS, and pressure and back pain associated with prolapse. Plaintiff reported having constant pain with periods of exacerbation. Plaintiff also reported being fatigued and having myalgia and arthralgia, muscle weakness, stiff and painful joints, dizziness, memory problems, coordination and gait problems, tremors, weakness, and ADHD. Upon examination, Dr. Steele diagnosed plaintiff with pelvic pain, endometriosis, and pelvic adhesive disease; frequency and urgency; new onset of insensate incontinence; and IBS. It was determined that plaintiff would undergo cystoscopy and hydrodistension surgery. (Tr. 264-74.)

Plaintiff returned to Dr. Johnson on September 3, 2009, with complaints of anxiety and depression. Plaintiff reported having lost her Paxil and that she forgets to take her Synthroid. Physical and psychological examinations were unremarkable. Dr. Johnson noted plaintiff's mood to be pleasant. Dr. Johnson prescribed Paxil for plaintiff's fatigue and malaise and instructed plaintiff to continue with her current medications for thyroid and hypertension. Plaintiff was instructed to return in four weeks. (Tr. 293-95.)

Plaintiff visited Dr. Stephanie M. Dettlebach on October 5, 2009, with reports of fatigue and weight gain since thyroid surgery in January 2009. Plaintiff reported having abdominal pain, frequent diarrhea, and worsening chronic back pain. Plaintiff reported regularly taking Naprosyn and Flexeril. It was noted that plaintiff also had depression and adult ADHD, but plaintiff reported that her depression was under good control and that she had not taken Ritalin since being out of work. Physical examination showed mild tenderness over the thoracic and lumbar spine and paraspinal muscles with mildly reduced flexion, but was otherwise unremarkable. Plaintiff was referred to physical

therapy and to gastroenterology.  Cyclobenzaprine was prescribed.  It was noted that plaintiff would not restart Ritalin unless she went back to work.  (Tr. 407-09, 652-54.)

X-rays of the lumbar and thoracic spine taken on October 13, 2009, in response to plaintiff's complaint of low back pain showed mild endplate degenerative changes of the mid-thoracic spine but no acute osseous abnormality.  (Tr. 435-36.)

On October 13, 2009, plaintiff visited Dr. Swaroopa Bartakke to establish care for thyroid problems.  In addition to noting plaintiff's medical history relating to the thyroid condition, Dr. Bartakke noted plaintiff's complaints of weight gain and chronic muscle aches, pains, and tenderness.  Plaintiff also complained of being tired, moody, and irritable with stress noted in relation to losing her job and having to sell her house. Plaintiff reported having insomnia with a tendency to take daytime naps, especially since losing her job in April.  Dr. Bartakke noted plaintiff's diagnosed conditions to include depression and ADHD.  Plaintiff denied having any bladder and/or bowel problems. Mental status examination was normal.  Dr. Bartakke prescribed Cytomel for continued fatigue.  (Tr. 324-26.)

Plaintiff visited Dr. Steele on October 22, 2009, for surgical follow up in relation to her complaints of chronic pelvic pain, back pain, and urinary frequency.  Plaintiff's diagnosis was noted to be chronic interstitial cystitis.  Plaintiff's current medications were noted to include Dyazide, Synthroid, Pentosin Polysulfate Sodium, Hydroxyzine (Atarax), Align, and Ritalin.  Plaintiff reported not having had any problems since her procedure, and instruction was given for medication and diet.  Elmiron was prescribed. (Tr. 258-64.)

Plaintiff returned to Dr. Dettlebach on November 9, 2009, and reported feeling more awake and alert since starting medication through endocrinology.  Plaintiff continued to report back discomfort and that Flexeril helped during the day but not much at night.  It was noted that plaintiff did not start physical therapy.  Plaintiff was instructed to continue on her current medications, and a new referral to physical therapy was made. (Tr. 404-06.)

Plaintiff visited Dr. Michael Heavey, a gastroenterologist, on November 11, 2009, regarding her complaints of abdominal pain and IBS. Physical examination showed tenderness about the lower abdomen. A colonoscopy performed on December 2, 2009, showed a few diverticula of the sigmoid colon and small internal hemorrhoids, but was otherwise normal. A high fiber diet was recommended. (Tr. 468-78.)

In January 2010, plaintiff complained to Dr. Bernstein that she had foot pain and knee pain. Stretching and manipulation were applied. (Tr. 483.)

On January 19, 2010, plaintiff visited Dr. Bartakke and reported that Cytomel helped with her fatigue. Plaintiff complained of continued moodiness, irritability, and weight gain. Plaintiff also complained of chronic low back pain with no radicular symptoms. Plaintiff continued to report having no bowel and/or bladder problems. Some depression was noted. Mental status examination was normal. Physical examination of the extremities was normal. (Tr. 318-20.)

In February 2010, plaintiff complained to Dr. Bernstein that she had medial leg pain and reported that massage of the left foot worked well. Plaintiff was instructed to stretch her calves. (Tr. 482.)

Plaintiff visited Dr. Aisenstat on February 15, 2010, and complained of depression, feeling overwhelmed, constant fatigue, and crying spells. It was noted that plaintiff had an upcoming appointment with a psychiatrist but wanted to restart her medication. Plaintiff also had multiple complaints of pain consistent with fibromyalgia. Plaintiff reported that she planned to apply for disability. Plaintiff reported having no fatigue or side effects from medications. Physical examination was unremarkable. Dr. Aisenstat prescribed Methylphenidate, Paroxetine (Paxil), and Clonazepam and ordered an MRI of the lumbar spine. (Tr. 398-99.)

Plaintiff visited Dr. Mark A. Scheperle on February 17, 2010. It was noted that plaintiff was a new patient. It was noted that plaintiff had completed treatment for thyroid cancer and could not lose weight. Plaintiff reported having gained sixty pounds in four years. Plaintiff also complained of fatigue. Osteoarthritis of the spine was noted.

Plaintiff was diagnosed with ADD, obesity, history of thyroid cancer, and hyperthyroidism. Laboratory testing was ordered. (Tr. 537-40.)

An MRI of the lumbar spine taken February 25, 2010, showed mild discogenic degenerative changes at the L4-L5 level. No significant disc herniation or stenosis was noted. (Tr. 402-03.)

On March 4, 2010, Dr. Johnson noted plaintiff to complain of dizziness and fatigue. Dr. Johnson noted plaintiff not to be taking most of the medications on her medications list, including Seroquel and Cyclobenzaprine. Plaintiff reported taking Clonazepam. It was noted that plaintiff was not adhering to her diet and that she engaged in no physical activity. General examination was unremarkable. Dr. Johnson diagnosed plaintiff with hypertension, psoriasis, hypothyroidism, and abnormal weight gain. Dr. Johnson also diagnosed plaintiff with fatigue and malaise, for which plaintiff was instructed to see a psychiatrist. (Tr. 287-89.)

Plaintiff visited Dr. Georgia Jones at Psych Care Consultants (Psych Care) on March 11, 2010, and complained of having no energy and of not wanting to get out of bed. Mental status examination showed plaintiff to be cooperative and calm with a depressed mood and blunted affect. Plaintiff's speech was noted to be delayed, but her thought process was intact. Plaintiff was oriented times four. Dr. Jones diagnosed plaintiff with major depressive disorder-recurrent-moderate and assigned a Global Assessment of Functioning (GAF) score of 30.[3] Dr. Jones prescribed Cymbalta and instructed plaintiff to continue with her other medications as prescribed by other doctors, including Clonazepam and Seroquel. (Tr. 525-27.)

Plaintiff returned to Dr. Bartakke on March 24, 2010, and continued to complain

---

[3] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders,* Text Revision 34 (4th ed. 2000). A GAF score of 21-30 indicates that behavior is considerably influenced by delusions or hallucinations, or there is serious impairment in communication or judgment (*e.g.,* sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends).

of moodiness, irritability, and weight gain. Plaintiff reported her muscle aches to have worsened since starting Cymbalta. Plaintiff reported her back pain, myalgia, and headaches to be the same but that her energy level had improved. Examination was unchanged. (Tr. 313-15.)

Plaintiff also visited Dr. Aistenstat on March 24, 2010, and reported increased middle back pain. Physical examination was unremarkable. Laboratory testing was ordered. (Tr. 388-91.) On that same date, plaintiff visited Dr. Heavey who noted plaintiff to have some improvement in her bowel symptoms. Physical examination was unremarkable. Plaintiff was instructed to take a fiber supplement. (Tr. 465-68.) During a visit with Dr. Scheperle on March 28, 2010, physical examination was unremarkable. Plaintiff was diagnosed with pituitary adenoma, history of thyroid cancer, and ADD. (Tr. 535-36.)

On April 20, 2010, plaintiff visited Dr. Anita Schnapp for a well woman examination and reported having no complaints. Dr. Schnapp noted plaintiff to have recently been diagnosed with interstitial cystitis and to be taking Elmiron, which helped the condition. (Tr. 353-54.)

Plaintiff returned to Dr. Scheperle on May 20, 2010, with complaints of increased back pain and occasional hematuria. Dr. Scheplerle noted pain about the right flank. No change was noted regarding plaintiff's treatment. (Tr. 533-34.)

Plaintiff visited Dr. Aisenstat on May 26, 2010, with complaints of symptoms associated with allergies. Plaintiff reported having no fatigue or urinary or bowel problems. Physical examination was unremarkable. Plaintiff was provided prescriptions for her upper respiratory symptoms. (Tr. 612-14.)

On June 2, 2010, Dr. Jones adjusted plaintiff's medications in response to her reports of decreased enjoyment, decreased ability to get started, and decreased concentration. (Tr. 523.)

Plaintiff returned to Dr. Bernstein on June 6, 2010, and complained of constant pain and hand numbness affecting her fingers. Dr. Bernstein noted this to be a new

condition. Manipulation was performed. (Tr. 482.)

A CT scan of the abdomen and pelvis taken June 8, 2010, in response to plaintiff's complaints of abdominal and back pain showed a small hiatal hernia and a left adrenal adenoma. (Tr. 543.)

On July 2, 2010, Dr. Jones noted plaintiff to have an improved mood and an unremarkable mental status examination. Plaintiff reported having good days and bad days. Plaintiff was continued on her current medications. (Tr. 522.)

Plaintiff reported to Dr. Scheperle on July 20, 2010, that she experienced excessive fatigue. Physical examination was unremarkable. (Tr. 531-32.) An MRI of the brain taken July 23, 2010, yielded normal results. (Tr. 541-42.)

Plaintiff visited a licensed clinical social worker (LCSW) at Psych Care on August 25, 2010, and reported that she had been sick "off and on" and that she had thyroid cancer in remission, diverticulitis, fibromyalgia, partial hysterectomy, interstitial cystitis, back pain, endometriosis, and pre-diabetes. Plaintiff reported feeling overwhelmed. It was noted that plaintiff was scheduled to see Dr. Jones in September. Plaintiff was instructed to keep a daily journal. (Tr. 700.)    Plaintiff failed to appear for a scheduled appointment with Psych Care on September 1, 2010. (Tr. 699.)

On September 1, 2010, Sherry Bassi, Ph.D., a consultant with disability determinations, completed a Mental RFC Assessment wherein she opined that in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions but not significantly limited in her ability to remember locations and work-like procedures as well as in her ability to understand and remember very short and simple instructions. In the domain of Sustained Concentration and Persistence, Dr. Bassi opined that plaintiff was moderately limited in her ability to carry out detailed instructions but was not otherwise significantly limited. In the domains of Social Interaction and Adaptation, Dr. Bassi opined that plaintiff had no significant limitations. Dr. Bassi concluded that plaintiff could perform simple tasks, relate adequately to others in a low-stress social environment, and adapt to routine

changes in a work environment. (Tr. 557-59.) In a Psychiatric Review Technique Form completed that same date, Dr. Bassi opined that plaintiff's depression resulted in mild limitations in activities of daily living and in her ability to maintain social functioning; moderate limitations in her ability to maintain concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Tr. 560-71.)

Plaintiff returned to Dr. Aisenstat on September 10, 2010, for medication follow up regarding depression and her thyroid condition. Plaintiff made no complaints but requested a more natural form of thyroid medication. It was noted that plaintiff had less back pain since undergoing breast-reduction surgery.[4] Plaintiff continued to express concern regarding her weight, and Dr. Aisenstat instructed plaintiff as to diet and exercise and recommended exercise thirty minutes a day at least five days a week. Dr. Aisenstat noted diet and medication to help with plaintiff's IBS symptoms, and plaintiff reported no bowel or urinary problems. Dr. Aisenstat added Neurontin to plaintiff's medication regimen for pain associated with fibromyalgia. (Tr. 601-04.)

Plaintiff visited Dr. Bernstein in September 15, 2010, and complained of mid to low back pain. Dr. Bernstein noted x-rays of the thoracic spine to show hyperkyphosis and osteophytic spurring from T5 to T10.[5] Dr. Bernstein diagnosed plaintiff with thoracodynia associated with flex fixation with concomitant spondylosis. Mechanized traction and manipulation was administered. (Tr. 673.) Plaintiff visited Dr. Bernstein on two more occasions in September 2010 and complained of back stiffness and pain in her feet, ankles, and face. Manipulation was administered as well as massage of the soft tissues. (Tr. 672.)

Plaintiff met with the LCSW at Psych Care on September 15, 2010, and reported that she was not feeling rested even when she slept through the night. Plaintiff reported having negative thought patterns. Plaintiff was encouraged to keep a journal. On

---

[4] Plaintiff underwent such surgery on August 5, 2010. (Tr. 547-50.)

[5] These x-rays referred to by Dr. Bernstein do not appear in the record.

September 22, plaintiff reported having disturbed sleep and was provided relaxation techniques. On September 29, plaintiff reported concerns about losing her insurance. Plaintiff was encouraged to take a self-esteem workshop. (Tr. 697-99.)

Plaintiff visited Dr. Scheperle on October 8, 2010, and complained of jaw pain. Plaintiff was diagnosed with TMJ (temporomandibular joint dysfunction) on the left, ADD, and hypothyroidism. (Tr. 681-82.)

On October 20, 2010, plaintiff reported to the LCSW at Psych Care that she was moving to her parents' house. On November 17, 2010, plaintiff reported that her parents were supportive but that she was considering living with a former roommate. (Tr. 696-97.)

Plaintiff returned to Dr. Bernstein on November 24, 2010, and reported having pain in her low back. Plaintiff reported taking less daily medications since her breast reduction surgery. Dr. Bernstein diagnosed plaintiff with musculoskeletal pain and subluxation. Manipulation was administered. (Tr. 672.)

Plaintiff met with the LCSW at Psych Care on January 6, 2011, and reported that she felt better with journaling. Plaintiff reported being upset recently regarding her physical condition and a personal relationship. Plaintiff was encouraged to exercise. (Tr. 694.) During a visit with Dr. Jones that same date, plaintiff reported that she was not sleeping well. Mental status examination showed plaintiff to have a mildly depressed mood, but was otherwise unremarkable. Plaintiff's affect was appropriately reactive, and plaintiff had normal memory, insight, and judgment. Plaintiff reported the status of her relationships with significant people to be fair. Dr. Jones noted plaintiff to be taking Cymbalta, Seroquel, and Clonazepam. Plaintiff was instructed to continue with her current medications. (Tr. 701.)

Plaintiff returned to Dr. Aisenstat on January 21, 2011, and reported having horrible depression. It was noted that plaintiff had recently lost her insurance. Dr. Aisenstat noted plaintiff to be taking Cymbalta as prescribed by another physician. Plaintiff was noted to be compliant with her medication, and she denied having any

medication side effects. Physical examination was unremarkable. Medications prescribed at this appointment included Cytomel, Synthroid, Mobic, and Norflex. (Tr. 595-600.)

Plaintiff met with the LCSW at Psych Care on March 2, 2011, and reported having pain that was suspected to be associated with fibromyalgia. Plaintiff reported that she stopped taking Seroquel because it made her agitated and angry, but that taking Cymbalta helped her sleep. Plaintiff reported spending time at home with her parents and with a friend. Plaintiff reported that she felt bad for being unable to manage her life as she used to. Plaintiff was encouraged to exercise daily. (Tr. 693.)

Plaintiff visited Dr. Scheperle on May 4, 2011, and complained of muscle weakness, black outs, joint pain, and tingling in her right hand and left leg. Dr. Scheperle diagnosed plaintiff with hypothyroidism, post-menopause, and fibromyalgia. Dr. Scheperle recommended that plaintiff get an MRI of the head. (Tr. 679-80.)

On May 5, 2011, plaintiff reported to the LCSW at Psych Care that she was not sleeping and was caught up in a friend's "drama." Plaintiff expressed concern regarding upcoming testing for multiple sclerosis. (Tr. 692.) Plaintiff visited Dr. Jones that same date and reported increased anxiety and that she wanted to cry. Dr. Jones noted plaintiff's mood to be moderately depressed with a blunted affect. Mental status examination showed plaintiff's memory to be impaired, with normal insight and fair judgment. Plaintiff was prescribed Paxil, Cymbalta, Clonazepam, and Dalmane. (Tr. 690.)

Plaintiff visited Dr. Aisenstat on July 21, 2011, who noted plaintiff's blood pressure medication to have been recently adjusted, with good results. Plaintiff reported becoming tired after minimal activity. Plaintiff was encouraged to exercise to lose weight. Plaintiff complained of overall pain, including pain in the right hip and left knee. Plaintiff's hip was normal upon examination. Plaintiff reported stopping Gabapentin because she felt it was ineffective. It was recommended that plaintiff get an MRI of the

spine, but plaintiff expressed concern regarding the cost and stated that she would wait and save money for the test. Dr. Aisenstat noted plaintiff to have good medication compliance. Physical examination was unremarkable. Dr. Aisenstat diagnosed plaintiff with hypothyroidism, hypertension, numbness in right leg, fibromyalgia, fatigue, joint pain, myalgia, and hypercholesteremia. Laboratory testing was ordered. In addition to blood pressure medication, Dr. Aisenstat prescribed Flexeril and Ultram. (Tr. 588-94.)

Plaintiff returned to Dr. Aisenstat on September 13, 2011, who noted plaintiff to have multiple complaints. Plaintiff reported waking up at night feeling heaviness in her back. Plaintiff also reported having pain in her neck. Physical examination was unremarkable. Plaintiff reported that Cymbalta really helped with her mood. Dr. Aisenstat diagnosed plaintiff with thyroid cancer, hypothyroidism, other malaise and fatigue, and joint pain. Laboratory tests were ordered. Plaintiff reported that she was transferring to a free clinic because of lack of insurance and that she did not want any testing performed through Dr. Aisenstat's office because of cost. (Tr. 583-88.)

Plaintiff met with the LCSW at Psych Care on September 27, 2011, and reported being under severe financial stress. Plaintiff reported that her physician gave her a limited prescription for Cymbalta and that she lies in bed and cries when she is without the medication. Plaintiff also reported having some fibromyalgia pain. Plaintiff reported not being suicidal but felt as though she was a burden. Plaintiff reported that she wanted to work but was unable to do so. Plaintiff was encouraged to keep a daily journal. (Tr. 691.)

Plaintiff visited Dr. Bernstein on two occasions in September and October 2011 with complaints of mid-thoracic pain, low back pain, and neck pain. Manipulation was administered. (Tr. 671.)

Plaintiff visited Dr. Jones on October 1, 2011, and reported significant financial stress, health issues, and interrupted sleep. Dr. Jones noted plaintiff's mood to be moderately depressed with a blunted affect. Mental status examination showed plaintiff's memory to be fair, with normal insight and fair judgment. Plaintiff was prescribed Paxil,

Cymbalta, Clonazepam, and Dalmane.  (Tr. 689.)

Dr. Bernstein completed a Physical RFC Questionnaire on October 23, 2011, in which he reported that he began treating plaintiff in August 2002 for her diagnosed condition of myofascitis of concomitant pelvic and vertebral subluxation.  Dr. Bernstein reported that plaintiff exhibited symptoms of low back pain, neck pain, mid-thoracic pain, left mandibular pain, and left hand numbness and that the back pain was aggravated by standing associated with plaintiff's sales position.

Dr. Bernstein reported that plaintiff's impairment was objectively seen through mild reversal of the cervical lordotic curve and thoracic arthritis with hyperkyphosis.  Dr. Bernstein noted plaintiff's response to treatment to be "normally good" but that the frequency of treatment was limited by expense and distance from home.  Dr. Bernstein opined that plaintiff's depression and anxiety contributed to plaintiff's physical condition.  Dr. Bernstein opined that plaintiff's pain and other symptoms would frequently interfere with plaintiff's concentration on a daily basis.  Dr. Bernstein opined that plaintiff would be incapable of tolerating work stress of even low stress jobs.  Dr. Bernstein opined that plaintiff could walk one to two city blocks without rest or severe pain; could sit for one hour at a time after which she must lie down; could stand for forty-five minutes at a time after which she must lie down or briefly sit; could sit for a total of less than two hours in an eight-hour workday; could stand and/or walk about two hours in an eight-hour workday; and must walk for five minutes every thirty to forty-five minutes during an eight-hour workday.

Dr. Bernstein opined that plaintiff would require a job that permits shifting positions at will between sitting, standing, or walking.  Dr. Bernstein further opined that plaintiff would need to take four or five unscheduled breaks for a period of five to ten minutes each during an eight-hour workday.  Dr. Bernstein opined that plaintiff could occasionally lift and carry ten pounds and frequently lift and carry less than ten pounds.  Dr. Bernstein opined that plaintiff could occasionally stoop, bend, crouch, squat, and climb ladders or stairs, and could frequently twist.  Dr. Bernstein estimated that plaintiff

would be absent from work more than four days a month as a result of her impairments or treatment therefor. Dr. Bernstein reported that plaintiff experienced such limitations on account of her impairments since August 2002. Dr. Bernstein also opined that plaintiff's chronic lethargy and frequent dizziness attributable to an inner ear condition and/or medication side effects affected plaintiff's ability to work. (Tr. 674-78.)

Dr. Scheperle completed a Physical RFC Questionnaire on October 25, 2011, in which he reported that he began treating plaintiff in April 2009 for her diagnosed conditions of neurofibroma, fibromyalgia, osteoarthritis, and pituitary adenoma. Dr. Scheperle reported that plaintiff exhibited symptoms of subcutaneous fibromas, fatigue, and chronic pain that included myofascial trigger pain and daily incapacitating pain.

Dr. Scheperle reported that plaintiff's impairment was objectively seen through myofascial triggers. Dr. Scheperle noted medication side effects to include fatigue and poor sleep quality. Dr. Scheperle opined that plaintiff's depression and anxiety contributed to plaintiff's physical condition, but noted that plaintiff was being followed by Dr. Jones for her psychiatric impairments. Dr. Scheperle opined that plaintiff's pain and other symptoms would constantly interfere with plaintiff's concentration on a daily basis. Dr. Scheperle opined that plaintiff would be incapable of tolerating work stress of low stress jobs, noting that even low stress jobs tend to exacerbate plaintiff's condition.

Dr. Scheperle opined that plaintiff could not walk any distance without rest or severe pain; could sit for thirty minutes at one time; could stand for twenty minutes at one time after which she must lie down or walk; could sit for a total of less than two hours in an eight-hour workday; could stand and/or walk less than two hours in an eight-hour workday; and must walk for fifteen minutes every fifteen minutes during an eight-hour workday. Dr. Scheperle opined that plaintiff would require a job that permits shifting positions at will between sitting, standing, or walking, but noted that plaintiff is unable to work.

Dr. Scheperle further opined that plaintiff would need to take more than ten unscheduled breaks for a period of fifteen minutes each during an eight-hour workday.

Dr. Scheperle opined that plaintiff's legs should be elevated while sitting. Dr. Scheperle opined that plaintiff could occasionally lift and carry ten pounds and less than ten pounds. Dr. Scheperle opined that plaintiff could occasionally twist; could rarely stoop, bend, crouch, or squat; and should never climb ladders or stairs. Dr. Scheperle estimated that plaintiff would be absent from work about four days a month as a result of her impairments or treatment therefor.

Dr. Scheperle reported that plaintiff experienced such limitations on account of her impairments since April 30, 2009. Dr. Sheperle reported that "patient has challenges not only with vocation, but has difficulty in maintaining self with [activities of daily living]. She follows routinely with her [appointments] with me and Dr. Jones. She is quite motivated and smart yet physically impaired, which now mutually compromises patient." (Tr. 683-88.)

Plaintiff visited Dr. Randa Sawaf-Hajji at the South County Health Center on October 26, 2011, for complaints relating to her thyroid condition and arthritic pain. Plaintiff reported that she did not currently exercise but sometimes would walk one block. Plaintiff reported her current medications to be Synthroid, Liothyronine, Cymbalta, Paxil, and Clonazepam. Physical examination yielded normal results, including normal strength and tone with no atrophy, spasticity, or tremors; and normal gait and station. Plaintiff was provided medication for hypertension, and laboratory tests and x-rays were ordered. (Tr. 704-06.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. The ALJ found that plaintiff had not engaged in substantial gainful activity since April 30, 2009, the alleged onset date of disability. The ALJ found plaintiff's degenerative disc disease of the lumbar spine; myalgia; chronic pelvic pain arising from interstitial cystitis and residuals of endometriosis, uterine prolapse, and associated reconstructive procedures; menopause; obesity; major

depressive disorder; and ADD to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13-23.) The ALJ determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations:

> she can understand, remember, and carry out at least simple instructions and non-detailed tasks; can respond appropriately to supervisors and coworkers; can adapt to routine, simple work changes; can perform work at a normal pace without production quotas; and should not work in a setting which includes constant and regular contact with the general public.

(Tr. 23.) The ALJ found plaintiff unable to perform any of her past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined plaintiff able to perform other work as it is exists in significant numbers in the national economy, such as office helper and stock checker. The ALJ thus found plaintiff not to be under a disability. (Tr. 31-33.)


## V. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A).

   To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

   The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

   To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record

and consider:

1. The credibility findings made by the ALJ.
2. The plaintiff's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the plaintiff's impairments.
6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)). The Court must also consider any evidence that fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

A.      Consideration of Opinion Evidence in Assessing RFC

Plaintiff claims that the ALJ's RFC assessment is not supported by substantial evidence on the record as a whole because of the ALJ's failure to accord proper weight to the opinions rendered by Drs. Scheperle and Bernstein. Plaintiff contends that the ALJ's determination to discount the opinions of these treating physicians left the record devoid of opinion evidence, thereby resulting in the RFC assessment being unsupported by some medical evidence in the record. For the following reasons, plaintiff's arguments fail.

A claimant's RFC is what a claimant remains able to do despite her limitations. 29 C.F.R. § 404.1545; *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, the observations of treating physicians and others, and the claimant's description of her limitations. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002); *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); *Dunahoo*, 241 F.3d at 1039 (*citing Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); *see also* 20 C.F.R. § 404.1545(a). An ALJ's determination as to a claimant's RFC must be supported by some medical evidence in the record. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. § 404.1527(f)(2)(ii).[6] The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. § 404.1527(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

---

[6] Citations to 20 C.F.R. § 404.1527 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause. This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this

20 C.F.R. § 404.1527(d)(2). However, a medical source's opinion that an applicant is "unable to work" involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit. *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 404.1527(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. *Id.* The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." *Id.*

In his written decision here, the ALJ determined to accord little weight to the opinions expressed in Dr. Scheperle's October 2011 RFC Questionnaire, finding the opinions to be internally inconsistent as well as inconsistent with Dr. Scheperle's own treatment records. These reasons to discount Dr. Scheperle's opinions are supported by substantial evidence on the record as a whole.

First, the ALJ detailed the exertional limitations Dr. Scheperle found plaintiff to experience on account of her physical impairments, including the limitations that plaintiff could stand and walk for less than two hours total in an eight-hour workday and could not walk any city blocks without rest or pain. The ALJ noted, however, that such limitations were inconsistent with Dr. Scheperle's simultaneous opinion that plaintiff must walk every fifteen minutes for fifteen minutes at a time, "which suggests continuous walking." (Tr. 25.) Internal inconsistencies in a physician's opinion constitute good reason to accord less deference to the opinion. *Wagner v. Astrue*, 499 F.3d 842, 849-50 (8th Cir. 2007) (and cases cited therein). The ALJ also noted that Dr. Scheperle's own treatment

discussion but does not otherwise change the substance therein.

records were inconsistent with the extreme limitations set forth in the October 2011 Questionnaire. Specifically, the ALJ noted such records to show that Dr. Scheperle never referred plaintiff to a specialist, never prescribed an assistive device, and never prescribed narcotic pain medication and, further, that plaintiff's physical examinations with Dr. Scheperle were generally normal and demonstrated very few objective signs that would support the extreme limitations set out in the October 2011 Questionnaire. Indeed, a review of Dr. Scheplerle's treatment notes shows only that plaintiff exhibited right flank pain in May 2010 and complained of jaw pain in October 2010 with symptoms of TMJ. After this October 2010 appointment, plaintiff did not visit Dr. Scheperle until May 2011, at which time Dr. Scheperle first diagnosed plaintiff with fibromyalgia. As noted by the ALJ, however, no objective signs of this impairment are recorded in Dr. Scheperle's treatment notes; nor is there any record of debilitating effects or associated treatment consistent with the extreme limitations as later opined in October 2011.

Where limitations listed in a treating physician's RFC assessment "'stand alone' and were 'never mentioned in [the physician's] numerous records of treatment' nor supported by 'any objective testing or reasoning[,]'" an ALJ is permitted to discount the opinions rendered in such assessment. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (*quoting Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)). *See also Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (little evidentiary weight accorded to functional limitations set out in Medical Source Statement because previous treatment notes did not report any significant limitations); *Halverson v. Astrue,* 600 F.3d 922, 930 (8th Cir. 2010) (inconsistency between treating physician's treatment records and his functional assessment provides good reason for ALJ to discount physician's opinion).

In addition, the ALJ found Dr. Scheperle's opinions to be inconsistent with other substantial evidence of record and to be based primarily on plaintiff's subjective complaints. These reasons to discount Dr. Scheperle's opinions are likewise supported by substantial evidence on the record as a whole. The ALJ thoroughly summarized the objective medical evidence of record, which showed only mild and sporadic tenderness

of the spine; diagnostic images of mild degenerative changes to one level of the spine; no atrophy, weakness, decreased range of motion, or positive trigger points; and no abnormal gait or posture.

The ALJ further noted that plaintiff's complaints of pelvic pain and associated symptoms resolved during the alleged disability period with surgical procedures and medication. Inconsistency with other substantial evidence is itself a sufficient reason to discount a treating physician's opinion. *Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005). Given the inconsistencies and lack of other evidence to support the limitations set out in Dr. Scheperle's October 2011 Questionnaire, the ALJ determined that such opined limitations appeared to be overly based on plaintiff's subjective complaints. Where a treating physician's opinions are largely based on a claimant's subjective complaints rather than on objective findings, an ALJ does not err in giving such opinions less than controlling weight. *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012).

Finally, the ALJ accorded very little weight to Dr. Scheperle's opinion that plaintiff was "unable to work" inasmuch as such a finding is an issue reserved to the Commissioner and cannot be determined by a physician. The ALJ did not err in this determination. *Ellis,* 392 F.3d at 994-95.

With respect to the opinions expressed in Dr. Bernstein's October 2011 RFC Questionnaire, the ALJ first noted that, as a chiropractor, Dr. Bernstein was not an acceptable medical source under the Regulations and thus not capable of rendering a medical opinion as defined by the Regulations. This reason to discount the "medical" opinion of Dr. Bernstein was not error. 20 C.F.R. § 404.1513(a), (d); *Ingram v. Chater*, 107 F.3d 598, 604 n.4 (8th Cir. 1997). As noted by the ALJ, however, evidence from a chiropractor may be used to show how the severity of an impairment affects a claimant's ability to work. 20 C.F.R. § 404.1513(d); *see also McDade v. Astrue*, 720 F.2d 994, 999 (8th Cir. 2013). The ALJ considered Dr. Bernstein's opinions in this vein and determined to accord the opinions very little weight. For the following reasons, this determination was not error.

First, the ALJ noted that Dr. Bernstein set out exertional limitations in his October 2011 Questionnaire that, among other things, limited plaintiff to standing/ walking less than two hours in an eight-hour workday and limited her lifting to no more than ten pounds. The ALJ also noted that Dr. Bernstein reported in the Questionnaire that plaintiff suffered from these limitations since he began treating her in August 2002. As noted by the ALJ, however, plaintiff worked full time through April 2009 with such work requiring lifting more than 100 pounds and standing for three to four hours each day. Because the plaintiff performed substantial work activity with exertional abilities greatly exceeding those as opined by Dr. Bernstein and during the period in which Dr. Bernstein opined that plaintiff was so limited, the ALJ did not err in according little weight to Dr. Bernstein's opinions because of their inconsistency with this other evidence. *Goff,* 421 F.3d at 790-91.

The ALJ also determined to accord little weight to Dr. Bernstein's opinions to the extent they addressed plaintiff's psychological factors and medication side effects, finding such matters to be outside of Dr. Bernstein's purview. This determination was not error. *See Brosnahan v. Barnhart*, 336 F.3d 671, 676 (8th Cir. 2003) (ALJ properly discounted provider's opinion because it was based partly on area outside of provider's expertise).

Finally, the ALJ determined to accord little weight to Dr. Bernstein's opinions inasmuch as they were unsupported by other evidence of record. For the same reasons as discussed *supra* with respect to the lack of substantial evidence supporting Dr. Scheperle's opinions, the ALJ did not err in making this same finding with respect to Dr. Bernstein's opinions.

Plaintiff appears to argue that her diagnosed condition of depression, as credited by the ALJ's determination to accord great weight to Dr. Bassi's Mental RFC Assessment, provides support for Dr. Scheperle's medical opinion regarding her physical limitations. Depression, when diagnosed by a medical professional, can act as objective medical evidence of pain to the same extent as an x-ray film. *See Cox v. Apfel*, 160 F.3d

1203, 1207 (8th Cir. 1998) (*citing* 20 C.F.R. §§ 404.1508, 404.1528.) In *Cox*, however, the claimant was repeatedly diagnosed with depression that caused exaggerated feelings of pain. *Id.* at 1206. Here, the only reference to plaintiff's depression having a pain component is that made by Drs. Bernstein and Scheperle in their October 2011 RFC Questionnaires. As noted above, such opinions as to plaintiff's psychological impairment are outside the purview of these providers' specialties and thus not entitled to great weight. *See Brosnahan*, 336 F.3d at 676. Further, none of plaintiff's mental health providers at Psych Care Consultants nor any other physician treating plaintiff's symptoms of depression recorded in their treatment notes or otherwise that plaintiff's depression contributed to her perception of pain. As such, in the circumstances of this case, the ALJ's failure to credit Dr. Scheperle's opinions as to plaintiff's *physical* limitations on the basis of plaintiff's diagnosed mental impairment, with nothing more, was not error.

Finally, plaintiff appears to argue that by discounting the opinions of Drs. Scheperle and Bernstein, the record was devoid of any medical opinion evidence upon which the ALJ could base his RFC assessment. Plaintiff's argument is misplaced. As an initial matter, the undersigned notes that the ALJ did not entirely discredit this opinion evidence, as averred by plaintiff, but considered such evidence and accorded it little weight. Nevertheless, the ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians" in determining a claimant's RFC. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (internal quotations marks and citation omitted) (alteration in *Martise*). Instead, the ALJ is required to consider the entirety of the record when determining a claimant's RFC, which is what the ALJ did here. *Cf. Holmstrom v. Massanari*, 270 F.3d 715, 720-21 (8th Cir. 2001) (ALJ did not err in discounting opinion evidence where other medical records show the effect of claimant's impairments).

A review of the ALJ's decision shows the ALJ to have conducted an exhaustive review of the medical evidence of record, including opinion evidence and observations of

treating physicians and others. The ALJ evaluated all of the opinion evidence of record and provided good reasons for the weight accorded to each opinion. For the reasons set out above, substantial evidence on the record as whole supports the ALJ's determination as to the weight he accorded the opinion evidence in this cause.

In addition, upon conclusion of his discussion of specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's RFC and specifically set out plaintiff's non-exertional limitations and work-related activity plaintiff could perform based on the evidence available in the case record. Because the extensive medical records – thoroughly reviewed by the ALJ – provide some medical evidence to support the ALJ's RFC determination, the determination must stand. *See Steed v. Astrue,* 524 F.3d 872, 876 (8th Cir. 2008). Although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did. The ALJ's determination must therefore be upheld even if the record could also support an opposite decision. *See Moad v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001); *Weikert*, 977 F.2d at 1252. *See also Phillips v. Colvin*, 721 F.3d 623, 629 (8th Cir. 2013) (it is the duty of the Commissioner to resolve conflicts in the medical evidence).

B.    Failure to Consider SSR 02-2p for Interstitial Cystitis

Plaintiff claims that the ALJ erred in his decision by failing to undergo the analysis required by Social Security Ruling 02-2p governing diagnosed conditions of interstitial cystitis. For the following reasons, the ALJ did not err.

Social Security Ruling 02-2p clarifies the Commissioner's policies for evaluating claims for disability on the basis of interstitial cystitis. SSR 02-2p, 2002 WL 32063799 (Soc. Sec. Admin. Nov. 5, 2002). The Ruling explains that interstitial cystitis is a "complex, chronic bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain" and "may be associated with other disorders, such as fibromyalgia, . . . irritable bowel syndrome, inflammatory bowel disease, [and] endometriosis[.]" *Id.* at *1.

The Ruling cautions that "[a]n assessment should be made of the effect interstitial cystitis has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," noting that interstitial cystitis can affect the ability to focus and sustain attention on the task at hand due to chronic pelvic pain; can lead to drowsiness and lack of mental clarity during the day because of nocturia (nighttime urinary frequency) that may disrupt sleep patterns; or can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night, because of urinary frequency. *Id.* at **5-6.

Here, the ALJ referred to SSR 02-2p in determining plaintiff's interstitial cystitis not to meet or medically equal a listed impairment when considered in conjunction with her other impairments. (Tr. 20.) In addition, the ALJ thoroughly summarized the treatment rendered for plaintiff's interstitial cystitis and related conditions, noting specifically that a combination of surgical procedures and medications resulted in significant improvement, with plaintiff reporting no bladder problems at subsequent appointments and not requiring any additional treatment. (Tr. 24-25.) Substantial evidence on the record as a whole supports this finding. Impairments that are controllable or amenable to treatment do not support a finding of disability. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).

Contrary to plaintiff's assertion, the ALJ here addressed SSR 02-2p when considering plaintiff's diagnosed impairment of interstitial cystitis and determined the evidence to show the effects of such impairment not to preclude plaintiff's performance of all work-related activities. Substantial evidence on the record as a whole supports this determination.

C.    Failure to Follow Prescribed Treatment

Plaintiff argues that the ALJ erred in his consideration of plaintiff's failure to follow prescribed treatment inasmuch as he failed to undergo the required analysis to determine whether compliance with such treatment would have restored plaintiff's ability

to perform work-related activity.  Plaintiff's argument is misplaced.

"Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."  *Roth*, 45 F.3d at 282.  Before a claimant is denied benefits because of a failure to follow a prescribed course of treatment, the ALJ must examine the circumstances surrounding such failure and determine on the basis of the evidence of record whether the prescribed treatment would restore the claimant's ability to work or sufficiently improve her condition.  *Burnside v. Apfel*, 223 F.3d 840, 843-44 (8th Cir. 2000); 20 C.F.R. § 404.1530(a).

Here, the ALJ did not base his determination of non-disability on plaintiff's failure to comply with prescribed treatment.  Although plaintiff appears to assert that the ALJ determined that her failure to follow prescribed treatment precluded a finding of disability, a review of the ALJ's decision shows it not to contain such a determination. Instead, the ALJ considered plaintiff's noncompliance with treatment only in relation to determining plaintiff's credibility.[7]  (*See* Tr. 29-30.)  Such consideration is permissible. *Wildman v. Astrue*, 596 F.3d 959, 968-69 (8th Cir. 2010).

A review of the ALJ's decision shows that the ALJ considered the entirety of the record in determining whether plaintiff's impairments were disabling.  Although the ALJ considered evidence of plaintiff's noncompliance with prescribed treatment as a factor in determining credibility, which he is permitted to do, the ALJ did not base his adverse determination only on such noncompliance.  The ALJ was therefore not required to examine the circumstances surrounding plaintiff's noncompliance and determine on the basis of the evidence of record whether the prescribed treatment would restore plaintiff's

---

[7]  Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  Because the ALJ's credibility determination is supported by substantial evidence on the record as a whole, this

ability to work or sufficiently improve her condition.

D.    Hypothetical Question Posed to Vocational Expert

Based on her arguments above that the ALJ failed to properly weigh the opinion evidence in this cause and that no medical evidence supported the ALJ's RFC assessment, plaintiff contends that the RFC assessment was necessarily flawed and thus provided an insufficient basis for the hypothetical question posed to the vocational expert.  Plaintiff argues, therefore, that the vocational expert's testimony given in response to this hypothetical question cannot constitute substantial evidence to support the ALJ's adverse decision.  Other than the arguments discussed *supra*, plaintiff provides no additional argument nor identifies any other issue relating to the hypothetical question posed to the vocational expert or the ALJ's reliance on testimony given in response thereto.  Nor does plaintiff present any argument or evidence demonstrating that she suffered restrictions more limiting than as determined by the ALJ and posed to the vocational expert in the hypothetical.  *Cf. Robson v. Astrue,* 526 F.3d 389, 393 (8th Cir. 2008) (claimant did not identify what limitations were missing from hypothetical).  An ALJ is not required to disprove every possible impairment.  *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

For the reasons set out above on the claims raised by plaintiff, the ALJ did not err in his consideration of the relevant medical and other evidence in this cause, including opinion evidence, in determining plaintiff's RFC.  Because the ALJ's RFC assessment was supported by substantial evidence, the hypothetical question based on this RFC was proper.  Accordingly, the vocational expert's testimony given in response to this hypothetical question constituted substantial evidence to support the ALJ's decision.  *Renstrom,* 680 F.3d at 1067-68; *Martise*, 641 F.3d at 927.

_____

Court is bound thereby.  *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).

## VI.  Conclusion

For the reasons set out above, the Commissioner's decision that plaintiff was not disabled is supported by substantial evidence on the record as a whole. The Commissioner's final decision is affirmed.

A separate Judgment Order is issued herewith.


_____/s/  David D. Noce_____
UNITED STATES MAGISTRATE JUDGE


Signed this  21st day March, 2014.